UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Case No. 12-56678

HEIDI L. BRINKLEY,                                  Chapter 13

        Debtor.                                     Judge Thomas J. Tucker
_____/

**OPINION REGARDING CERTAIN MORTGAGE CREDITOR
OBJECTIONS TO CONFIRMATION**

**I. Introduction**

The Debtor in this Chapter 13 case, Heidi L. Brinkley, filed her bankruptcy petition on July 16, 2012, and filed a Chapter 13 plan on July 30, 2012.[1] Debtor later amended her plan, three times.[2] The most recent amended plan was filed on July 3, 2013 (the "Plan").[3]

This case came before the Court on July 15, 2013, for an evidentiary hearing on certain objections to confirmation filed by Bank of America, N.A. ("Green Tree"),[4] and Wells Fargo Bank, N.A. ("Wells Fargo")[5](collectively, the "Creditors"); specifically the objection of each of these Creditors that the Debtor's Plan is not proposed in good faith, as required by 11 U.S.C. § 1325(a)(3).[6] Another issue that arose during the evidentiary hearing concerns the application of

---

[1] Docket # 22.

[2] Docket ## 52, 55, 141.

[3] Docket # 141.

[4] Docket # 58. By the time of the evidentiary hearing, Green Tree Servicing, LLC was the servicer for the Bank of America mortgage debt that is a subject of this opinion.

[5] Docket # 40.

[6] Each of the Creditors filed amended objections to confirmation, after the evidentiary hearing. *See* Docket ## 167 (Wells Fargo) and 170 (Green Tree). Each of the amended objections repeated, as one ground of objection, that the Debtor's Plan is not filed in good faith.

the mortgage anti-modification provision in 11 U.S.C. § 1322(b)(5).[7]

After the evidentiary hearing, the Court entered an order requiring the Creditors, and permitting the Debtor, to file briefs. The parties filed such briefs. This opinion states the Court's findings of fact and conclusions of law regarding the confirmation objections now being addressed.

**II. Debtor's latest amended Chapter 13 plan, and the Creditors' objections to confirmation**

Debtor owns six parcels of real estate that she proposes to retain, two of which are discussed in this opinion. Debtor's Plan proposes to pay the Trustee $5,576.86 per month for 60 months, plus 100% of all tax refunds Debtor receives or becomes entitled to after commencement of the case.[8] In Class Five, the Plan treats secured claims of several creditors, by proposing either to modify or "cram down" the secured claims.[9] In Class Eight, the Plan proposes to pay non-priority unsecured creditors a minimum dividend of 0%.[10]

Green Tree has a claim, as of the petition date, in the amount of $133,655.03,[11] that is secured by a mortgage in Debtor's real estate located at 18930 Adrian Street, Southfield, Michigan (the "Adrian Street Property"). Wells Fargo has a claim, as of the petition date, in the

---

[7] Other objections to confirmation by these Creditors, and by others, remain pending, and are not discussed in this opinion.

[8] Plan (Docket # 141) at 1, §§ I.A, I.B and I.C.

[9] *Id.* at 2-3, § I.D.5.

[10] *See id.* at 3, § I.D.8, which states that "General Unsecured Claims" will "be paid 0% of such amounts with interest at the rate of 0.00% per annum. This Plan shall provide either the percent stated or shall continue for the length stated, whichever will offer the greater dividend to general unsecured creditors in this class."

[11] Claim 9-1 in the Court's claims registry for this case, filed November 19, 2012.

amount of $232,689.76,[12] that is secured by a mortgage in Debtor's real estate located at 2900 Beaver Ridge Loop, Clermont, Florida (the "Florida Property").

Debtor's Plan proposes to bifurcate, or "cram down" Green Tree's claim, by allowing a Class Five secured claim in the amount of the alleged "Market Value" of the Adrian Street Property, $25,000, and paying that secured claim with interest at 3% per annum, at the rate of $449.22 per month for 60 months.[13] The balance of the claim would be treated as a general unsecured claim, in Class Eight (0% minimum dividend).

Debtor's Plan proposes to bifurcate Wells Fargo's claim, by allowing a Class Five secured claim in the amount of the alleged "Market Value" of the Florida Property, $129,000, and paying that secured claim with interest at 3% per annum, at the rate of $2,317.91 per month for 60 months.[14] The balance of the claim would be treated as a general unsecured claim, in Class Eight (0% minimum dividend).

Green Tree and Wells Fargo have objected to the Plan's proposed treatment of their claims on numerous grounds, several of which are not discussed in this opinion. Their objections that are covered by this opinion are (1) that the Debtor's Plan is not proposed in good faith, as required by 11 U.S.C. § 1325(a)(3); and (2) Green Tree's objection that under 11 U.S.C. § 1322(b)(2) its secured claim cannot be modified, because, in the words of the statute, that secured claim is "secured only by a security interest in real property that is the debtor's principal residence."

---

[12] Claim 11-1 in the Court's claims registry for this case, filed November 26, 2012.

[13] Plan at 2, § I.D.5.

[14] Plan at 2, § I.D.5.

III. **Discussion**

   **A. Green Tree's § 1322(b)(2) objection**

The issue raised by Green Tree's § 1322(b)(2) objection is whether the Adrian Street Property "is the debtor's principal residence." Green Tree says that it is; Debtor says that it is not. The Court agrees with Green Tree, for the following reasons.

Debtor admits, and the Court finds, that Debtor lived at the Adrian Street Property, and nowhere else, as of the July 16, 2012 petition date in this case.[15] And the Court finds that the Debtor continued to live at the Adrian Street Property, and nowhere else, until sometime in November 2012, when Debtor moved out of that property, and moved in with her daughter at 16225 Oxley St., Southfield, Michigan, where Debtor has lived at least through the date of the evidentiary hearing. Debtor rented out the Adrian Street Property, beginning on December 1, 2012, to Curtis Cannon, under a written lease agreement, for $1,200 per month.[16] Mr. Cannon actually moved into the Adrian Street Property sometime in December 2012, and has paid the monthly rent due under the lease to the Debtor.[17]

Debtor argues that the Adrian Street Property is not her principal residence for purposes of § 1322(b)(2) because she moved out of that property in November 2012, some four months after filing her Chapter 13 petition, with no intention to move back. Green Tree argues that

---

[15] Debtor testified to this fact during the evidentiary hearing. *See also* Debtor's Br. (Docket # 182) at 1.

[16] Creditors' Ex. 6; testimony of Debtor; testimony of Curtis Cannon.

[17] During closing argument in the evidentiary hearing, Creditors' attorney argued that the lease arrangement with Mr. Cannon is "phony," and that Debtor was still using the Adrian Street Property as her residence. These assertions are not supported by any evidence, however, and the Court rejects them and finds otherwise, as stated in the text above.

4

because the Adrian Street Property was Debtor's principal residence as of the petition date, § 1322(b)(2)'s anti-modification clause applies to preclude modification of Green Tree's mortgage.

The Court agrees with Green Tree. The Court concludes that because the Adrian Street Property was Debtor's principal residence as of the petition date, it must be considered Debtor's principal residence for purposes of § 1322(b)(2). The fact that Debtor changed her principal residence some four months after the petition date does not change this conclusion.

There is a divergence of opinion among the cases about what point(s) in time are relevant for determining "principal residence" status under § 1322(b)(2). The Court *In re Baker*, 398 B.R. 198, 201-03 (Bankr. N.D. Ohio 2008) discussed the conflicting case law on this issue:

> Section 1322(b)(2) does not explicitly specify when a secured creditor's status is to be determined for purposes of applying the provision's antimodification clause. A divergence of opinion has arisen as a result. . . . [S]ome courts have found that the date of the prepetition transaction between the Parties—normally, when the loan agreement is executed—should constitute the salient event. *Id.* at *5; *In re Williamson*, 387 B.R. 914, 920 (Bankr.M.D.Ga.2008); *In re Smart*, 214 B.R. 63, 67 (Bankr.D.Conn.1997). The reasoning for this position is based largely on the concern that a contrary reading could lead to debtor manipulation. That is, if a date other than the transaction date were utilized, debtors could seek to nullify the application of the antimodification clause by subsequently modifying the use of their property.
>
> For example, "a debtor could easily sidestep the ... home mortgage exception by adding a second living unit to the property on the eve of the commencement of his Chapter 13 proceeding." *In re Bulson*, 327 B.R. 830, 846 (Bankr.W.D.Mich.2005). Or, as also observed, a homeowner poised to file for protection under Chapter 13 could seek temporary tenants prior to their filing to negate the application of § 1322(b)(2)'s antimodification clause. *In re Guilbert*, 176 B.R. 302, 305 (D.R.I.1995). Such concerns were well summarized in the case of in *In re Smart*:

> a lender supplying financing on an owner-occupied single-family home would be assured that its rights under the subject mortgage could not be modified through bifurcation in a future Chapter 13 case involving its borrowers. By contrast, a construction which makes the petition date (or motion decision date) the status determination date injects additional creditor risk into the mortgage loan transaction by creating the opportunity for debtors to manipulate their place of principal residence after completion of the mortgage transaction and prior to (or during) their Chapter 13 case, thereby "bootstrapping" modification of a mortgage that was taken in reliance upon the security serving as the principal residence.

*Id*. at 68.

The majority of courts, however, have held that the critical date for deciding whether a creditor qualifies for protection under the antimodification clause is the date the petition is filed. *See, e.g., In re Howard*, 220 B.R. 716, 718 (Bankr.S.D.Ga.1998); *In re Lebrun*, 185 B.R. 665, 666 (Bankr.D.Mass.1995); *In re Wetherbee*, 164 B.R. 212, 215 (Bankr.D.N.H.1994); *In re Churchill*, 150 B.R. 288, 289 (Bankr.D.Me.1993). *See also* 2 K. Lundin, Chapter 13 Bankruptcy § 121.2 at 121–3–121–9 (3d ed.2000) (collecting cases). From strictly a policy perspective, this approach has ironically found favor with some courts for the same overall reason just noted above—the potential for a party to manipulate the application of the antimodification clause. The difference here being, failure to consider the petition date could lead to creditor manipulation. *In re Dinsmore*, 141 B.R. 499, 505–06 (Bankr.W.D.Mich.1992). Specifically, utilizing the petition date was seen as a way to prevent creditors from disavowing, on a postpetition basis, a security interest in property not constituting a debtor's principal residence so as to gain the protections of § 1322(b)(2)'s antimodification clause. As explained in the case of *In re Howard*:

> The critical date for deciding whether a creditor qualifies for section 1322(b)(2) protection is the date that the petition is filed. This rule discourages

6

> creditors from disclaiming security interests post-petition in order to gain protection from modification of their claims under section 1322(b)(2). This limitation on modification was intended to protect the traditional home mortgage lender. A creditor's post-petition actions should not allow it to benefit from this narrow exception to a debtor's right to restructure his debts.
>
> 220 B.R. 716, 718 (Bankr.S.D.Ga.1998) (internal quotations omitted).
>
> Beyond this policy reason, however, courts looking to the petition date as the critical date for determining the application of the antimodification clause, have relied upon the specific language of the statute. For example, while it is acknowledged that § 1332(b)(2) lacks explicit reference to its timing, the use of the word "claim" within the antimodification clause has been held to signify that the petition date should be the Court's focus, since a "claim" in "bankruptcy arises at the date of the filing of the petition." *In re Wetherbee*, 164 B.R. 212, 215 (Bankr.D.N.H.1994). Also from a temporal standpoint, it has been observed that, looking to the circumstances as they exist at the time the petition is filed, conforms to the provision's use of the present tense "is"—with the antimodification clause providing "other than a claim secured only by a security interest in real property that is the debtor's principal residence[.]" (emphasis added). *In re Churchill*, 150 B.R. 288, 289 (Bankr.D.Me.1993).

The court in *Baker* chose to use "a type of hybrid approach, whereby both the circumstances as they exist on the petition date as well as the underlying agreement must be considered. Specifically, factual findings under § 1322(b)(2) should be made by reference to the status of the parties' agreement, including any amendments, as it exists on the petition date." *Id.* at 203.

In addition to the three temporal approaches described in *Baker* — namely, considering (1) what was the debtor's principal residence only as of the pre-petition date of the mortgage loan

transaction; (2) what was the debtor's principal residence only as of the bankruptcy petition date; and (3) a hybrid-type approach as described in *Baker* — another case took a fourth approach. The court in *In re Kelly*, 486 B.R 882, 886 (Bankr. E.D. Mich. 2013) held that the proper approach is to determine "where debtors intend to reside during and after their bankruptcy." The *Kelly* court explained:

> Implicit in 11 U.S.C. § 1322(b)(2) is Congress' concern that if debtors are allowed to reduce their mortgage payments on their principal residence over the life of their Chapter 13 plan of reorganization, the ability of mortgagees to extend affordable credit would be impacted. Based on the Congressional intent in enacting 11 U.S.C. § 1322(b)(2), this Court believes that the more important temporal consideration is not where debtors reside on the one day they file their petition (a date which may be subject to manipulation) but rather where debtors intend to reside during and after their bankruptcy. This Court concedes that it is a more fact intensive process to analyze what property debtors intend to use as a principal residence during and after their bankruptcy, but it does a disservice to 11 U.S.C. § 1322(b)(2) to allow a single date to determine which property is debtor's principal residence. The facts which should be considered in determining whether a property is a debtor's principal residence during and after the bankruptcy are similar to the facts to be considered in analyzing, under state law, whether a property is debtor's domicile.
>
> The facts that should be considered by the Court in determining principal residence are as follows: (1) where did the debtor reside on the date of filing of bankruptcy? (2) did the debtor move out of their principal residence either shortly before or after the filing of the bankruptcy? (3) did the debtor move into a property debtor had previously used as a rental property? (4) where does the debtor intend to reside for the duration of the bankruptcy? and (5) does the debtor retain title to the property even though debtor is not residing in the property at the time of filing for bankruptcy? (6) did the debtor start renting his/her principle residence to tenants around the time debtor filed for bankruptcy?

*In re Kelly*, 486 B.R at 885-86 (footnote omitted).

This Court respectfully disagrees with the *Kelly* case. As quoted above, *Kelly* expressed the concern that determining a debtor's principal residence by where the debtor resides on the petition date can lead to "manipulation" — presumably by the debtor, for example, by changing his or her residence right before filing the bankruptcy petition. But that concern about debtor manipulation is not alleviated by the standard that *Kelly* adopts. Under *Kelly*, right before filing bankruptcy a debtor can change his or her principal residence by changing his or her *intentions* (presumably, with such intentions being measured as of the petition date)[18] about where to reside in the future (*i.e.*, during and after the bankruptcy case), and thereby engage in manipulation as well. This is the same kind of debtor manipulation as when a debtor moves to a new principal residence right before filing bankruptcy.

Any approach to this issue that one takes is subject to manipulation by either the debtor or the creditor. There is no perfect solution, but of the four approaches, this Court agrees with the majority approach, as described in *Baker*, namely, that the debtor's principal residence under § 1322(b)(2) is where the debtor principally resides as of the bankruptcy petition date. *See In re Wetherbee*, 164 B.R. 212, 215 (Bankr. D.N.H. 1994); *In re Churchill*, 150 B.R. 288, 289 (Bankr. D. Me. 1993); *In re Lebrun*, 185 B.R. 665, 666 (Bankr. D. Mass.1995). It follows that a post-petition change of residence by the debtor does not change what "is" the debtor's principal residence under § 1322(b)(2). Nor does it matter if, as of the petition date, the debtor intends to change his or her residence at some point in the future.

---

[18] Presumably, the *Kelly* standard measures a debtor's future intentions about where they will reside, as those intentions exist at the petition date. If *Kelly* meant to hold that the debtor's future intentions may or must be measured as of some date later than the petition date, it does not define what date that is. And such an approach would be even more open to debtor manipulation.

9

Using this petition-date approach is consistent with the fact that many things relating to a bankruptcy case are fixed as of, or measured as of or from, the petition date, even though that date is subject to manipulation by the debtor — the debtor can manipulate the petition date because he or she chooses when to file a voluntary bankruptcy petition. For example, as pointed out by the quotation above from *Baker*, claims are generally fixed and measured as of the petition date. Similarly, the Court must determine a debtor's claimed exemptions as of the date they filed their bankruptcy petition. *See In re Demeter*, 478 B.R. 281, 286 (Bankr. E.D. Mich. 2012) and cases cited therein.

Using this approach, however, does not mean that everything will be clear cut. The Court must acknowledge that determining what is a debtor's "residence" as of the petition date, or as of any other date, may be difficult in some cases, such as in a case where the debtor lives in more than one place, or where the debtor is staying in temporary lodging while his long-time home is being repaired from fire damage. And in the case of a debtor that has more than one residence as of the petition date, determining which is the debtor's "principal" residence may be difficult in some cases.

But this case does not present any of these difficulties. Here it is very clear that as of the petition date, the Debtor resided at the Adrian Street Property and nowhere else. She only changed that principal residence *four months after filing her petition*.[19] Therefore, the Adrian

---

[19] In the evidentiary hearing, Debtor testified that as early as the petition date in this case (July 16, 2012), she intended to convert the Adrian Street Property into a rental property, and move out of it, when she could find a tenant to rent that property. The Court finds that this testimony is not credible, and disbelieves it. For one thing, this testimony is flatly inconsistent with the first Chapter 13 plan that Debtor filed, on July 30, 2012 (Docket # 22). That plan, filed 14 days *after* the petition date, proposed to *surrender* the Adrian Street Property. (Docket # 22 at 1-2, § I.D.2.) If Debtor really had intended, as of the petition date, to convert the Adrian Street Property to a rental property and move out of it, Debtor

10

12-56678-tjt    Doc 202    Filed 11/05/13    Entered 11/05/13 11:25:22    Page 10 of 15

Street Property "is" the Debtor's "principal residence" for purposes of § 1322(b)(2). It follows from this that the Debtor may not confirm a plan that modifies Green Tree's secured claim without Green Tree's consent. Green Tree's § 1322(b)(2) objection is sustained.

### B. The Creditors' "good faith" objections

In order to confirm the Plan, Debtor must demonstrate that "the plan has been proposed in good faith." 11 U.S.C. § 1325(a)(3). The Creditors argue that Debtor's Plan does not meet this requirement. The United States Court of Appeals for the Sixth Circuit has explained and discussed this requirement, as follows:

> As a starting point, the bankruptcy code requires that, in order to be confirmed, a debtor's plan must, among other things, be "proposed in good faith." 11 U.S.C. § 1325(a)(3). In that context, "[o]ur circuit's good faith test requires consideration of the totality of circumstances." *Society Nat'l Bank v. Barrett* (*In re Barrett*), 964 F.2d 588, 591 (6th Cir.1992) (citations omitted). Among the circumstances to be considered in determining whether a plan has been proposed in good faith are the following:
>
> (1) the debtor's income;
>
> (2) the debtor's living expenses;
>
> (3) the debtor's attorney's fees;
>
> (4) the expected duration of the Chapter 13 plan;
>
> (5) the sincerity with which the debtor has petitioned for relief under Chapter 13;
>
> (6) the debtor's potential for future earning;

---

would have proposed to *retain* that property, not surrender it, and to cram down Green Tree's secured claim, as Debtor's current Plan proposes. But Debtor did not do this until she filed her second amended plan, on November 6, 2012 (Docket # 55), almost four months after the petition date. (Debtor's first amended plan, filed on November 1, 2012 (Docket # 52), did not mention the Adrian Street Property or Green Tree's secured claim at all.)

11

> (7) any special circumstances, such as unusually
> high medical expenses;
>
> (8) the frequency with which the debtor has sought
> relief before in bankruptcy;
>
> (9) the circumstances under which the debt was
> incurred;
>
> (10) the amount of payment offered by debtor as
> indicative of the debtor's sincerity to repay the debt;
>
> (11) the burden which administration would place
> on the trustee;
>
> (12) the statutorily-mandated policy that bankruptcy
> provisions be construed liberally in favor of the
> debtor.
>
> *See id.* at 592. We have also emphasized that good faith is a
> fact-specific and flexible determination. *See Metro Employees
> Credit Union v. Okoreeh-Baah* (*In re Okoreeh-Baah*), 836 F.2d
> 1030, 1032-33 (6th Cir.1988).

*Alt v. United States* (*In re Alt*), 305 F.3d 413, 419 (6th Cir. 2002).

### 1. Creditors' arguments that Debtor's proposed retention of the Florida Property is not proposed in good faith

Creditors argue that Debtor's Plan is not proposed in good faith, in part, because Debtor's proposed cram-down treatment of Wells Fargo's secured claim will cause a financial drain on the bankruptcy estate. Debtor proposes to retain the Florida Property, rather than surrender it, and pay the alleged $129,000 "Market Value" of the Florida Property by monthly payments (including 3% interest) of $2,317.91 over 60 months.

The Court agrees with Creditors. Debtor's proposed retention of the Florida Property will require total monthly payments over the 60-month life of the plan that are significantly higher

12

than the rental income that Debtor generates from this property. The Debtor rents the Florida Property to her adult son and his wife, under an oral month to month lease, for $2,200 per month.[20] Even assuming that Debtor's son and his wife actually pay the rent required each month, this $2,200 per month is substantially less than what it will cost Debtor to retain this property under the Plan. The Plan proposes the following monthly payments for 60 months:

| | |
|---|---|
| $2,317.91 | (Class Five, to pay Wells Fargo's crammed-down secured claim) |
| $76.54 | (Class Five, to pay secured claim owed to the homeowners' association, Lake Residential Property Owners Association ("Lost Lake"))[21] |
| $56.00 | (Class Three, to be paid directly by Debtor to Lost Lake, under assumed executory contract) |

These payments total $2,450.45 per month. And this monthly payment total does not include anything for taxes or insurance on the Florida Property, which Debtor certainly would have to pay over the life of the 60-month Plan in order to retain this property. (Debtor presented no evidence at the evidentiary hearing of how much these expenses will be.)

Thus, under Debtor's Plan it would cost $250.45 per month more than the rental income being generated by the Florida Property for the Debtor to retain that property, *plus* the expenses for taxes and insurance for the property. Debtor's retention of the Florida Property under the Plan, therefore, would be a substantial financial drain on the estate, and would substantially reduce what the Debtor otherwise could pay to unsecured creditors (one of whom would be Wells Fargo, with respect to the unsecured portion of its bifurcated claim).

The Debtor did not prove any valid, good faith justification for this. Debtor does not use

---

[20] Debtor's Ex. A; Creditors' Ex. 16; testimony of Debtor.

[21] *See also* Claim No. 13-1 in the Court's Claims Registry, filed by Lost Lake.

the Florida Property as a residence. Rather, Debtor testified that it is used only as a residence by Debtor's adult son and his wife, both of whom can and do have their own employment, and who can and should support themselves. In her testimony Debtor denied using this property for herself, even as a vacation home.

For these reasons, and under the totality of the circumstances, the Court agrees with Creditors, that to the extent the Debtor's Plan proposes to retain the Florida Property, rather than surrender it, the Plan is not proposed in good faith. The Court will not confirm a Chapter 13 plan under which Debtor retains, rather than surrenders, the Florida Property.

**2. Creditors' other "good faith" arguments**

Creditors also argue that the Plan is not proposed in good faith because (1) this is the Debtor's third bankruptcy case (with the prior two cases having been dismissed); (2) the Debtor testified falsely about having moved out of the Adrian Street Property and having leased it to Curtis Cannon; and (3) the Debtor's schedules were incorrect in certain respects.

The Court rejects argument number (2) above, because the Court has found that Debtor did *not* testify falsely about having moved out of the Adrian Street Property and having leased it to Curtis Cannon.[22] The Court has found as not credible, however, Debtor's testimony that as of the petition date she intended to move out of the Adrian Street Property and rent it out as soon as she could find a tenant.[23] But under the totality of the circumstances, this is not a sufficient basis to establish that Debtor's Plan was not proposed in good faith.

With respect to Creditors' arguments (1) and (3) above, these particular circumstances,

---

[22] *See supra* note 17, and accompanying text.

[23] *See supra* note 19.

14

12-56678-tjt    Doc 202    Filed 11/05/13    Entered 11/05/13 11:25:22    Page 14 of 15

including the particular errors in Debtor's schedules on which Creditors rely, do not amount to a sufficient basis to establish that Debtor's Plan was not proposed in good faith, under the totality of the circumstances.

For these reasons, Creditors' "good faith" objection to confirmation will be sustained in part, as described above, and otherwise will be overruled.

**IV. Conclusion**

For the reasons stated in this opinion, the Court will enter an order sustaining Creditors' objections to confirmation in part, and denying confirmation of Debtor's Plan. The order will give Debtor leave to file and serve an amended plan that is consistent with this opinion within 14 days. If Debtor does not file and serve such an amended plan within 14 days, or if Debtor seeks to voluntarily dismiss this case rather than file an amended plan, the Court will dismiss this bankruptcy case, and bar the filing of any new bankruptcy case by or against the Debtor for 180 days. Under the circumstances, such a 180-day bar would be necessary and appropriate under 11 U.S.C. § 105(a) to carry out the provisions of the Bankruptcy Code, including the sections cited in this opinion, and also would be necessary and appropriate in order to prevent an abuse of process, which would occur if a new bankruptcy case were filed by or against this Debtor within the bar period.

**Signed on November 5, 2013**　　　　　　　　　　　　**/s/ Thomas J. Tucker**
　　　　　　　　　　　　　　　　　　　　　　　　　　　**Thomas J. Tucker**
　　　　　　　　　　　　　　　　　　　　　　　　　　　**United States Bankruptcy Judge**

15

12-56678-tjt　　Doc 202　　Filed 11/05/13　　Entered 11/05/13 11:25:22　　Page 15 of 15